J-S23016-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.C., MOTHER | : | No. 16 EDA 2020 |

Appeal from the Order Entered November 25, 2019
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): CP-51-DP-0002599-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: J.T.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.C., MOTHER | : | No. 17 EDA 2020 |

Appeal from the Decree Entered November 25, 2019
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): CP-51-AP-0001070-2016

BEFORE: NICHOLS, J., McCAFFERY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY McCAFFERY, J.: **FILED JUNE 03, 2020**

At Docket 17 EDA 2020, M.C. (Mother) appeals from the decree entered in the Philadelphia County Court of Common Pleas, granting the petition of the Philadelphia Department of Human Services (DHS) to terminate involuntarily Mother's parental rights to her minor son, J.T.C., (Child), pursuant to Section

2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[1]  At Docket 16 EDA 2020, Mother also appeals from the order changing Child's permanent placement goals to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.[2]  After review, we affirm.

Child was born in November 2014 to Mother and an unknown father (Father).  DHS became involved with the family shortly after Child's birth, after receiving a general protective services (GPS) report that Child tested positive for opiates and methadone at birth, and Mother tested positive for opiates, methadone, and cocaine.  N.T., 11/25/19, at 7.  Stephanie Hawkins, Community Umbrella Agency (CUA) case supervisor, testified at the termination hearing that CUA assisted in implementing in-home services for Mother to address her substance abuse and mental health issues.  *Id.* at 7-8.  Mother completed an intake at Parkside rehabilitation facility, at which time she reported a 21 year-long history of cocaine abuse and a 15 to 18 year-long history of opiate abuse.  *Id.* at 13.  Mother also reported using 7 to 15 bags of heroin daily.  *Id.*

---

[1] 23 Pa.C.S. §§ 2101-2938.  By separate decree the same day, the trial court also involuntarily terminated the parental rights of Child's unknown father. Trial Ct. Op., 2/4/20, at 1 n.1.

[2] This Court *sua sponte* consolidated these two appeals.  Furthermore, we note that although the captions identify the Child as J.C. and J.T.C., we clarify both matters concern the same child.

As safety concerns continued, on September 22, 2015, DHS filed a dependency petition. N.T. at 8. On October 5, 2015, following a hearing, the court adjudicated Child dependent, but allowed Child to remain in Mother's physical custody. *See* Order of Adjudication & Disposition, 10/5/15, at 1. Mother was ordered to participate in an assessment and/or evaluation, drug testing, and dual diagnosis at the Clinical Evaluation Unit (CEU). *Id.* at 2. Single case plan (SCP) objectives for Mother included: attending supervised visitation with Child at CUA; obtaining appropriate housing; attending dual diagnosis treatment; providing verification of employment and housing; engaging in Intellectual Disability (IDS) services; and attending parenting classes. N.T. at 5-9. Referrals were made to appropriate services, including to IDS, CEU, Behavioral Health Services (BHS), and housing. *Id.* at 5-9, 16. Ms. Hawkins requested that Mother sign releases so that her mental health treatment could be monitored, due to Mother's past diagnoses of bipolar disorder, depression, post-traumatic stress disorder, anxiety, and borderline personality disorder. *Id.* at 10.

On October 6, 2015, DHS obtained an order of protective custody (OPC) for Child (who was then approximately 11 months old) due to Mother's failure to comply with the safety plan and due to drug and alcohol issues. *See* Order for Protective Custody, 10/6/15, at 1. The following day, the court held a shelter care hearing, at which time Child was placed in foster care. *See* Shelter Care Order, 10/7/15, at 1. Mother was granted supervised visitation

with Child. ***Id.*** On October 27, 2015, DHS sought a finding of aggravated circumstances against Mother, after her parental rights to her three older children were involuntarily terminated.[3] ***See*** DHS' Mot. for Agg. Circumstances, 10/27/15, at 1-2. On October 29th, DHS filed an amended dependency petition as to Child. ***See*** DHS' Pet. for Adjudication of Dependency, 10/29/15, at 1-9.

Permanency review hearings were held in January, April, and July, 2016.[4] In January 2016, Mother was again referred to CEU for drug testing and dual diagnosis assessment. ***See*** Permanency Review Order, 1/4/16, at 1-2. At that time, Child's permanency goal was "return to guardian," and Mother was granted weekly supervised visitation with the requirement that she confirm visits 24 hours in advance. ***Id.*** In April 2016, a concurrent permanency goal of adoption was identified for Child, who was residing in a pre-adoptive foster home. ***See*** Permanency Review Order, 4/25/16, at 1; ***see also*** N.T. at 19.

On November 8, 2016, DHS filed petitions to involuntarily terminate the parental rights of Father and Mother pursuant to 23 Pa.C.S. § 2511(a)(1), (2),

_____

[3] The certified record is not clear as to whether the court made a finding of aggravated circumstances as to Mother. Nevertheless, this record omission does not affect our determination.

[4] The trial court did not make findings regarding Mother's progress towards reunification or compliance with her objectives in these orders.

(5), (8), and (b). On November 9th, DHS filed a petition seeking to change Child's permanency goal to adoption.[5]

The case was continued a number of times throughout 2017, as either attorneys or Mother were unavailable. *See*, *e.g.*, Status Review Order, 1/5/17; Status Review Order, 8/21/17. On January 11, 2018, the court held a permanency review hearing, but did not make additional findings as to Mother's progress or compliance. On September 11, 2018, the court held a permanency review hearing and granted Mother supervised visitation at DHS "once she avails herself." *See* Permanency Review Order, 9/11/18, at 1. Mother was transient and did not have a visit with Child from 2015 until June 2018, when she attended three out of ten scheduled visits. *Id.* Mother had an open bench warrant, was residing in Virginia with her father, and was only sometimes in Philadelphia. *Id.*

The matter was continued throughout 2018. On January 28, 2019, at the status review hearing, the court ordered Mother to present for drug testing. The matter was then continued until June 27, 2019, when the court held a permanency review hearing. Mother's visitation remained supervised, and she was again ordered to attend a drug screen.

On November 25, 2019, the court conducted a hearing on the goal change petition and the petition to involuntarily terminate Mother's parental

_____

[5] Amended goal change petitions were filed on November 21 and December 12, 2016.

rights. We note that at this time, Child was approximately five years old. At the hearing, DHS presented the testimony of CUA case supervisor Hawkins, and CUA visitation coach Frankie Ocasio. Child was represented by his attorney, Nghi Duong Vo.[6] Mother, represented by counsel, testified on her own behalf.

Ms. Hawkins testified that Mother did not complete her objectives. For instance, Ms. Hawkins explained, when asked about her employment, Mother provided documentation on October 16, 2019. N.T. at 14-15. However, Ms. Hawkins had concerns the documentation was falsified because "[i]t was typed in all caps[ and] had no signature[ a]nd there were misspelled letters." *Id.* Ms. Hawkins stated:

> So I contacted the director of the agency, Metusso (sp) Piazza (sp). And he stated that the letter was falsified because he said all documentation goes through him . . . I did provide him with my updated contact information, but I think he missed a letter off of my email address, which happens with Turning Points. And he said — my understanding is the email bounced back, but that [Mother] did provide verification later that day dated the same day I spoke to him, October 16, 2019 verifying that she was employed at that time.

*Id.* Mother provided two pay stubs, but Ms. Hawkins stated her "understanding [was] that [Mother was] not employed." *Id.* at 15-16.

Ms. Hawkins further testified Mother's mental health remained a serious concern. N.T. at 10. Ms. Hawkins could not verify that Mother's mental health

---

[6] At the termination hearing, Attorney Vo indicated he could not convey Child's preferences because Child was non-verbal. N.T. at 46. Attorney Vo has not filed an appellate brief on Child's behalf.

was stable, and, accordingly, it would be unsafe for Child to have any unsupervised contact with Mother. *Id.* at 10-11. Ten days prior to the hearing, Ms. Hawkins requested Mother to sign Community Behavioral Health (CBH) releases to verify her treatment, but Mother refused. *Id.* at 10-11.

Ms. Hawkins testified she could not verify whether Mother completed drug and alcohol treatment due to, again, Mother's refusal to sign releases. N.T. at 11. Ms. Hawkins noted that at the previous permanency hearing in June 2019, Mother admitted she had used drugs recently and had relapsed on heroin and cocaine use multiple times over the last few years. *Id.* at 12. Ms. Hawkins reiterated Mother's decades-long struggle with opiate and cocaine addiction which, in combination with Mother's recent relapses, were safety concerns for CUA. *Id.* On cross-examination, the following exchange occurred:

> [Mother's counsel:] So, you're not aware that Mother successfully completed her intensive outpatient program at [Skills and Opportunities for Achievement and Responsibility (SOAR)]?
>
> MS. HAWKINS: No, I'm not[,] because I specifically asked her to sign releases. She stated no. Prior to walking in this hearing, I specifically asked her, "Was there any documentation you'd like to provide to me so I can present what you're doing at this hearing?" She refused. Her father did suggest that she give me the information, but she refused.

*Id.* at 25.

Ms. Hawkins testified Mother's visitation was nonexistent or sporadic through the history of the case. N.T. at 17-19. Mother did not visit Child at all from October 2015, when he was taken into DHS' care, until July 11, 2018.

*Id.* Mother came to a visit on July 18, 2018, but appeared to be high. *Id.* Mother was late to an August 1, 2018 visit, and the visit then lasted only 15 minutes. *Id.* Mother did not visit with Child again until July 3, 2019. *Id.* Child did not appear to suffer any harm from not visiting with Mother for almost three years. *Id.* at 18. Ms. Hawkins described Mother and Child's contacts during visits:

> I was present at the visit on 11/15/19. I mean, the visits seem to go fine. But what I get from the visits is that [Child] doesn't view her as his mother. I don't think that he personally even knows that that's his biological mother. It seems to me that he views [her] as someone that he plays with once a week.

*Id.* at 24-25. Child did not call Mother "Mother." *Id.* at 25.

CUA caseworkers had difficulty maintaining regular contact with Mother throughout the case. N.T. at 23. A prior caseworker made repeated attempts at home visits at an address Mother provided, and stated that the few times she was able to enter the residence, it did not appear to be lived in. *Id.* Mother refused to provide CUA caseworkers with her location, which made it difficult to provide outreach for issues such as medical appointments for Child. *Id.* at 24. Mother did provide a working phone number, but "she respond[ed] when she want[ed] to." *Id.* at 24.

Ms. Hawkins further testified to the following concerning Child's current placement. Child is in a pre-adoptive foster home, where he has lived for the last four years with his foster parents and their 16-year-old biological son. N.T. at 19-20. Child has a primary parent-child bond with his foster parents. *Id.* at 20. Child is considered to have special needs, as he has been diagnosed

with autism and is mostly non-verbal. *Id.* at 19-20. Foster parents are meeting Child's "significant" autism-related, medical, and developmental needs, and have been for the last four years. *Id.* at 20-21. Mother has not been involved with meeting Child's autism-related needs. *Id.* Anyone parenting Child on a full-time basis would need to be capable of managing Child's behaviors, which can be challenging in an unsupervised setting. *Id.* at 21. Ms. Hawkins believed that Child would not suffer irreparable harm if Mother's parental rights were terminated, but would suffer irreparable harm if he were removed from his foster home. *Id.* at 22.

Frankie Ocasio, CUA visitation coach, testified he has been involved with the family since in-home services were implemented five years prior to the termination hearing. N.T. at 26. Mr. Ocasio supervised recent visits, and noted Child did not have any emotional issues separating from Mother at the end of the visit. *Id.* at 27. When asked to describe Child's interaction with his foster parents, Mr. Ocasio stated, "[W]hen the foster parents say . . . 'We love you,' in Spanish, he will say it back to them as well. Wave to them goodbye. Hug and kiss. And the same . . . returning as well." *Id.* Mr. Ocasio observed that Child has a primary parent-child bond with his foster parents. *Id.*

With regard to Mother's visitation with Child, Mr. Ocasio observed numerous issues, the most glaring of which was lack of Mother's supervision. N.T. at 28. Specifically, during one visit, Child almost put his head into the toilet. *Id.* During another visit, Child grabbed things out of Mother's purse

- 9 -

when she was not looking. *Id.* Mother did not appear to understand it was necessary to constantly "keep up" with Child and maintain eye contact. *Id.* Mr. Ocasio had safety concerns for any unsupervised visitation with Child. *Id.* at 28-29. Mr. Ocasio also stated, "Foster parents also shared with me, [Child is] a runner. [So if Mother does not] hold onto him, very, you know, well-gripped[,] he may run off and into the streets." *Id.* at 29. Mr. Ocasio discussed Child's need for increased supervision with Mother, who was receptive to the recommendations. *Id.* at 31. However, Mother needed to be reminded every visit. *Id.* For example, Mr. Ocasio described Mother's eye contact with Child:

> [S]he'll turn away. Then he'll do something. I remind her, Hey, listen, this is what's going on. You need to pay attention to him. And she'll turn around quickly and redirect him. But, then, yet, again, she'll lose her focus again. And I have to remind her again.

*Id.* at 32 (quotation marks omitted). Mr. Ocasio testified he did not believe any irreparable harm would come to Child if Mother's rights were terminated, and believed it was in Child's best interest for Mother's parental rights to be terminated and Child's permanency goal changed to adoption. *Id.* at 29, 32.

Mother testified on her own behalf, and stated that, for the last six months, she had been living in Philadelphia in a recovery house. N.T. at 34. Mother claimed she was sober, was currently in drug and alcohol treatment, and had completed five or six months of intensive outpatient treatment. *Id.* Mother stated she was drug tested at the recovery house every other week, and drug tested at a clinic every other week. *Id.* at 35.

Mother stated she was drug tested once on June 27, 2019, after the permanency review hearing, at the request of CUA. N.T. at 35. When asked if she had tested positive, Mother first claimed she did not receive the result, and then that she had been drug tested three times that day. *Id.* at 36. The court, however, took judicial notice that Mother tested positive for opiates and cocaine on that day. *Id.* When asked if she had recently relapsed, Mother denied having done so, and stated that the last time she had relapsed was "the last court hearing[, June 27, 2019]." *Id.* at 37.

Mother claimed she had signed all requested releases, "except for CBH because I didn't see the reason of signing my whole medical history when every other — every other thing they wanted me to sign I had already signed." N.T. at 34-35. When asked when she last visited with Child, Mother stated,

> I missed my last visit because I was in the hospital Monday and Tuesday with facial cellulitis. And I've been really sick and on bed rest. And just when I was starting to get better, I just had lost track of time and — and days, and totally forgot to call and confirm . . . So it would have been the week prior.

*Id.* at 38. When asked why her parental rights should not be terminated, Mother stated that when Child was born she had been "forced to get back on methadone when [she] was clean." *Id.* at 40. Mother claimed that Child calls her "Mom" at visits. *Id.* at 41.

At the conclusion of the hearing, the court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and changed Child's permanency goal to adoption. ***See*** Permanency

Review Order, 11/25/19, at 1; N.T. at 46-48. On December 22, 2019, Mother filed timely, counseled notices of appeal and statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:

1. Whether the trial court committed reversible error, when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the [A]doption [A]ct, 23 Pa.[C.S.] § 2511(a)(1), (2), (5) and (8)[?]

2. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of [Child] as required by the [A]doption [A]ct, 23 Pa.[C.S.] § 2511(b)[?]

3. Whether the trial court abused its discretion in granting a goal change to adoption, where the goal change from reunification to adoption was not supported by clear and convincing evidence[?]

Mother's Brief at 8.[7]

We first note the relevant standard of review:

_____

[7] Mother's statement of questions — as well as her Pa.R.A.P. 1925(b) statement — raise a fourth issue:

Whether the trial court erred because the evidence was overwhelming and undisputed that [M]other demonstrated a genuine interest and sincere, persistent, and unrelenting effort to maintain a parent-child relationship with her child[?]

***See*** Mother's Brief at 8. However, Mother does not present any argument regarding this issue. Accordingly, we do not consider it. ***See In re W.H.***, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (failure to provide discussion of claim with citation to relevant authority results in waiver of claim).

- 12 -

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1215 (Pa. Super. 2015) (citations omitted). The decision to admit or exclude evidence is within the sound discretion of the trial court. *In re A.J.R.-H.*, 188 A.3d 1157, 1166–67 (Pa. 2018).

This Court has explained:

Termination of parental rights is governed by Section 2511 of the Adoption Act . . . which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***Adoption of C.D.R.***, 111 A.3d at 1215 (citation omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted). In order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). ***Adoption of C.D.R.***, 111 A.3d at 1215.

In her first issue, Mother argues the trial court abused its discretion by terminating her parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). We focus on her claims relating to Subsection 2511(a)(2). Mother avers she has worked to meet her objectives to the best of her ability. Mother's Brief at 17. Mother contends she attended a parenting class, had been sober "for a period of time" and was residing in a recovery house. ***Id.*** Mother also contends her father was ready and willing to testify regarding her sobriety, but was not permitted to do so. ***Id.*** No relief is due.

Subsections 2511(a)(2) and (b) provide:

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the

conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent . . . .

23 Pa.C.S. § 2511(a)(2), (b).

In order to terminate parental rights pursuant to 23 Pa.C.S.[ ] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

"The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."

*Adoption of C.D.R.*, 111 A.3d at 1216 (citation omitted). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010).

In finding grounds for the termination of Mother's parental rights, the trial court observed:

Applying . . . the elements set forth under [Section] 2511(a)(2) to the instant case, it is clear that DHS met their burden of demonstrating that termination was proper. The evidence established that "incapacity" and "refusal" under

- 15 -

[Section] 2511(a)(2) existed given that Mother failed to demonstrate a concrete desire or ability to remedy the problems that led to the Child's placement. Mother failed to cooperate with the services provided by CUA, including housing, drug and alcohol treatment and mental health treatment. Notably, Mother failed to sign releases to allow CUA to monitor her mental health and substance abuse treatment, which were the issues identified as causing Child to be adjudicated in 2015. Moreover, the evidence established that "neglect" existed given that Mother had not participated in the Child's medical treatment in four years, despite his significant special needs. This Court found that Mother's failure to fully comply with her objectives throughout the life of this case has left the Child without essential parental care, and the cause of such neglect, refusal and continued incapacity will not be remedied by Mother. Based on the foregoing, this Court found that competent evidence existed to justify the termination of Mother's parental rights pursuant to Section 2511(a)(2).

Trial Ct. Op. at 9-10 (citations to record omitted).

Our review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). We emphasize the trial court's finding that Mother had not complied with her objectives, and specifically that Mother refused to sign releases for her medical history and drug treatment. Even on the day of the termination hearing, Ms. Hawkins asked Mother to provide any documentation or releases regarding her treatment so it could be presented, and Mother refused. N.T. at 25. Similarly, although Mother claimed to be sober and residing in a halfway house, she admitted she relapsed at the time of the prior permanency hearing, which was approximately five months earlier. *Id.* at 37.

Furthermore, Mother's visitation with Child was sporadic. Mother did not visit Child from October 2015, when he was taken into DHS' care, through July 2018. N.T. at 17-19. In July 2018, Mother attended two visits, but

appeared to be under the influence at one visit. *Id.* In August 2018, Mother attended a single visit, but was so late the visit only lasted fifteen minutes. *Id.* Mother did not visit again for almost a year, in July 2019. *Id.* When asked about her visits, Mother gave equivocating explanations that she was "really sick" and "just when I was starting to get better, I just had lost track of time and — and days, and totally forgot to call and confirm." *Id.* at 38.

Finally, the testimony showed that Mother was incapable of properly supervising Child. Mr. Ocasio testified he repeatedly advised Mother of Child's need for increased and careful supervision. N.T. at 31-32. However, Mother needed to be repeatedly reminded to maintain eye contact with Child in order to redirect his behaviors. *Id.* at 28-29.

With respect to Mother's claim her father should have been allowed to testify about her sobriety,[8] we reiterate that the admission of evidence is within sound discretion of the trial court. *See In re A.J.R.-H.*, 188 A.3d at 1166–67. The trial court observed:

> [T]he testimony was she relapsed less than six months ago. The evidence is that in . . . late June of this year, she tested positive for both cocaine and opiates.
>
> The testimony is that up until July of this year, she hadn't visited for a year. And that was not — after having not visited for three years. How could his opinion on her drug usage help this [c]ourt?

N.T. at 44. We discern no error in this conclusion.

_____

[8] Mother does not develop her argument beyond the bald assertion that her father should have been allowed to testify.

We agree with the trial court that DHS established: Mother exhibited "repeated and continued incapacity, abuse, neglect or refusal;" that caused Child "to be without essential parental care, control or subsistence necessary for [her] is physical or mental well-being;" and Mother cannot or will not remedy the "causes of the incapacity, abuse, neglect or refusal." *See* 23 Pa.C.S. § 2511(a)(2); *In re Adoption of C.D.R.*, 111 A.3d at 1215. We thus do not disturb the trial court's ruling under Section 2511(a)(2). We need not address any other subsections of Section 2511(a). *See id.*

In her second issue, Mother argues the trial court erred in finding grounds for termination under Subsection 2511(b). She alleges DHS failed to prove that family ties did not exist between her and Child. Mother's Brief at 21. Mother contends the court erred in terminating her parental rights "without providing [her] the opportunity to bind [sic] with her child, given her newfound sobriety." *Id.* Mother also avers the court erred in failing to fully consider Child's needs and welfare, because she was attempting to bond with Child, who called her "mom" during visits where they played together. *Id.* at 22. We disagree.

Our Supreme Court has stated:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." [T]he determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention"

- 18 -

should be paid to discerning the effect on the child of permanently severing the parental bond. . . .

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted). "[T]he court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). The court is not required to hear expert testimony, and social workers and caseworkers may offer evaluations. *Id.* "[W]here there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008).

> "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child."
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent . . . .

*Adoption of C.D.R.*, 111 A.3d at 1219 (citations omitted).

> With respect to Section 2511(b), the trial court
>
> determined that the Child would not suffer irreparable harm if Mother's parental rights were terminated. There was compelling testimony offered at the [termination] hearing that the Child does not have a primary parent-child bond with Mother. Ms. Hawkins testified that she is unaware if Child knows that Mother is his biological mother. Mother failed to offer any evidence establishing the existence of a parent-child bond. The testimony of both Ms. Hawkins and Mr. Ocasio demonstrated that the Child's primary bond is with his foster parent[s]. Furthermore, this [c]ourt found Mother's infrequent visits with the Child insufficient to foster a

- 19 -

meaningful and healthy parental connection. Notably, Mother failed to visit with Child from the time of his adjudication in October 2015 until July 2018, and then from August 2018 until July 2019. This Court believes that we are nowhere closer to reunification now than we were when this case first came in . . . October 2015.

Additionally, in determining that termination would best serve the needs and welfare of the Child, this Court considered that Mother has not been able to meet the Child's emotional, physical, and developmental needs, or provide the Child with a healthy, safe environment for four years prior to the [termination] hearing. In fact, Mother had never been to a medical appointment for Child despite his significant special needs. More importantly, there are significant safety concerns regarding Mother's ability to provide a safe environment for Child because of unwillingness to cooperate with CUA regarding her substance abuse and mental health treatment. . . .

Trial Ct. Op. at 13 (citations to record omitted and paragraph break added).

Upon review, we again discern no abuse of discretion. We emphasize that, although Mother testified that Child called her "mom" during visits, Ms. Hawkins testified Child does not call Mother "mom," and the trial court did not find Mother credible. The trial court found Mother was not able to properly supervise Child during visitations, and has attended only a few visits with Child in nearly five years. Further, Mother's own testimony did not mention any bond with Child, or even her own feelings of love and affection for Child. Accordingly, it is reasonable to infer that no parental bond exists. *In re K.Z.S.*, 946 A.2d at 763. Child has been in foster care for nearly five years, has seen Mother but a handful of times, during which Mother had to be redirected to supervise Child; Child deserves the love, permanency, and stability that his foster parents provide him. *See Adoption of C.D.R.*, 111

- 20 -

A.3d at 1219. Thus, the record supports the trial court's finding that Child's developmental, physical and emotional needs favor termination of Mother's parental rights pursuant to Section 2511(b). *See T.S.M.*, 71 A.3d at 267.

In her final issue, Mother argues that the court erred in changing Child's permanency goal to adoption.[9] She asserts the court failed to consider the factors set forth in 42 Pa.C.S. § 6351 and did not consider that Mother was capable of caring for Child. Mother's Brief at 23. Mother argues that, following the June 2019 hearing, she became and remained sober, completed a rehabilitation program, and was residing in a sober living facility. *Id.* She contends that the court abused its discretion in terminating her "burgeoning bond" with Child. *Id.* We disagree.

We review a juvenile court's permanency determination for an abuse of discretion. *Interest of A.B.*, 19 A.3d 1084, 1088 (Pa. Super. 2011).

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting."

_____

[9] The trial court did not address the goal change in its opinion.

*Id.* at 1088-89 (citations omitted).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> * * *
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1)(2).

In the instant case, we incorporate our above reasoning for affirming the termination of Mother's parental rights, and conclude the trial court did not abuse is discretion in changing Child's goal to adoption. Mother did not complete or provide documentation of the completion of any of her goals, and, indeed, refused to sign releases, even on the day of the termination/goal change hearing. N.T. at 11-25. From the time the goal change petitions were filed until the termination hearing, Mother had not obtained stable housing or undergone mental health treatment, had recently relapsed on heroin and cocaine use, and had provided falsified proof of employment. *Id.* at 10-25. Mother was still inconsistent in attending visits and incapable of properly supervising Child, and had not engaged in his medical treatment in any way.

*Id.* at 17-32.  Thus, the record supports the trial court's findings.  ***See Interest of A.B.***, 19 A.3d at 1088.

While Mother testified that since July 2019 she had made progress towards alleviating the circumstances leading to Child's placement — namely, achieving sobriety — such progress came only after five years in which Child was denied permanency.  ***See*** N.T. at 19-20, 34-35.  Mother's assertion she attempted to forge a bond with Child is not supported by the record; Mother missed visitations, once appeared for visitation under the influence, came to a visit late, and could not properly supervise Child at the few visitations she attended.  *Id.* at 17-25, 28-32.  Child viewed Mother as someone he played with rather than a parent, and, instead, he has a parental bond with foster parents.  *Id.* at 20, 24-25.  The trial court did not err in finding it was in Child's best interests to be adopted by his foster parents, who were appropriately caring for his emotional, physical, medical and developmental needs, and had been doing so for five years.  The court also did not err in changing Child's permanency goal from reunification to adoption.

For the foregoing reasons, we conclude the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b) and changed Child's permanency goal to adoption.

Goal-change order at 16 EDA 2020 affirmed.  Termination decree at 17 EDA 2020 affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 6/3/2020*